766 So.2d 837 (1999)
Ex parte Kevin Glenn KELLEY.
(Re Kevin Glenn Kelley v. State of Alabama).
1971725.
Supreme Court of Alabama.
June 11, 1999.
Rehearing Denied January 28, 2000.
James M. Sizemore, Jr., Montgomery, for petitioner.
Bill Pryor, atty. gen., and Frances R. Clement, asst. atty. gen., for respondent.
KENNEDY, Justice.
This is a civil-forfeiture case. Kevin Glenn Kelley appealed from an order of the Jefferson Circuit Court condemning his 1997 Pontiac Grand Prix automobile. The Court of Civil Appeals affirmed, without opinion, Kelley v. State, 766 So.2d 836 (Ala.Civ.App.1998) (with a special opinion by Monroe, J.). We have granted certiorari review. Kelley argues that the forfeiture violated the Excessive Fines Clauses of the Eighth Amendment to the United States Constitution and Art. I, § 15, of the Alabama Constitution of 1901. We reverse and remand.
On April 4, 1997, the district attorney for the Tenth Judicial Circuit filed a petition, pursuant to § 20-2-93, Ala.Code 1975, to condemn as contraband Kevin Glenn Kelley's 1997 Pontiac Grand Prix automobile. Kelley filed a motion to dismiss the petition, arguing, as a defense, that the condemnation violated the prohibition against excessive fines.
The circuit court held a hearing on August 4, 1997. The state presented the testimony of Scott Nelson, a member of the Birmingham Police Department's Drug Task Force. Nelson testified that, while he was positioned on the roof of Raymond's Market, he saw Kevin Glenn Kelley enter the parking lot of a nightclub called "The Studio," driving a 1997 Pontiac Grand Prix; that with Kelley was a male passenger in the right front seat; that Kelley parked the car directly below Nelson, and that Kelley and the passenger went into the nightclub; that Nelson smelled marijuana smoke coming from the *838 car when Kelley and the passenger exited it; that later Kelley's passenger came out of the nightclub and went to the Grand Prix and took something from the glove box and then went back inside the club; and that sometime later, Kelley, his passenger, and a female came to the car and that at that time Nelson and another officer approached them.
Nelson obtained Kelley's consent to search the car. He found 4 tablets of what he believed to be a drug called "Ecstacy" (it proved to be a controlled substance called aminorex) and a bag containing 6.2 grams of marijuana. Nelson placed the two men under arrest, but allowed the female to leave; and the two were charged with possession of a controlled substance in violation of § 13A-12-212(a)(1), a Class C felony. The two later confessed to having purchased six tablets of a controlled substance for $30 each. The amounts were sufficiently small that Kelley was not considered to be a "dealer," within the meaning of that term as it is used in § 40-17A-1(3), Ala.Code 1975, nor was the offense such that he was charged with trafficking. Kelley was adjudged a youthful offender and was sentenced to participate in the drug-court program; no fine was imposed upon him.
At the forfeiture hearing, Kelley presented evidence indicating that the 1997 Pontiac Grand Prix had been a gift from his grandmother, Mrs. Shirley Knighten. Mrs. Knighten testified that she had purchased the car for Kevin with funds from her inheritance. Her opinion of the value of the vehicle was $30,000 to $35,000. Included in the evidence presented was 1) Mrs. Knighten's check to the Capitol Chevrolet dealership for $22,865 to purchase a motor vehicle known as a Blazer; 2) her check to the Cobb Pontiac dealership for $6,895, the balance due on the purchase price of the Grand Prix above the trade-in value allowed for the trade of the Blazer toward the purchase of the Grand Prix; 3) her check to an electronics store for $746 for installing a stereo and alarm system in the car; 4) her check to the Cellular One company for $323 for a telephone for the car; 5) her check to the CKR company for $650 for installing a radio in the car; 6) a receipt from the Pelham Tire and Performance Center store for tires and wheels for the Grand Prix, in the amount of $1,488 and a credit-card receipt showing that she had paid to put new tires on the car.
The trial court declared the vehicle contraband, condemned it, and ordered it forfeited to the State of Alabama; the court awarded it to the Birmingham Police Department to be used for law-enforcement purposes. Kelley appealed from the final order of condemnation.
When the Court of Civil Appeals affirmed the trial court's forfeiture order, without an opinion, Judge Monroe concurred specially. He wrote:
"The evidence is undisputed that controlled substances were found in Kelley's car. Kelley was charged with possession of a controlled substance; he was not charged with distribution or trafficking. However, the forfeiture statute provides that any vehicle used `in any manner to facilitate' possession of a controlled substance is subject to forfeiture. § 20-2-93(5), Ala.Code 1975. Furthermore, this court has held that using a vehicle to transport marijuana for personal use and possession is sufficient to support the forfeiture of the vehicle. Gilbert v. State, 686 So.2d 266 (Ala.Civ. App.), cert. denied, 686 So.2d 267 (Ala. 1996). Thus, applying the law to the facts before us in this case, I must concur.
"I write to point out, however, that the state should use discretion in exercising its forfeiture power. The state's power to confiscate the property of its citizens carries with it the great responsibility of using that power as it was intended. It was my understanding that when the drug forfeiture laws were enacted, they were intended to be used to take away any financial reward derived from the sale of illegal drugs, that is, they would be used to take away dealers' profits or the property they bought *839 with those profits. I am the first one to agree to the forfeiture of the cars, airplanes, yachts, homes, and other fruits of illegal drug sales. I also agree that forfeiture laws should be used to take away property used in furthering the production, importation, sale, receipt, possession, or concealment of drugs. I do not believe, however, that the forfeiture laws were meant to allow the government to take whatever property of value happens to be available when one is found to be in possession of illegal drugs.
"In this case, there is no contention that the vehicle was paid for out of profits made from the sale of illegal drugs. In fact, the evidence is undisputed that Kelley's grandmother had paid for the forfeited car, a Pontiac Grand Am valued at $30,000. That being the case, I wonder who is punished more upon the forfeiture of the car, the grandmother or Kelley. Furthermore, Kelley is young enough to have been granted youthful offender status for the criminal proceedings that arose from this incident. Although youthful offender status is not an option in civil forfeiture cases, I believe that the age, prior criminal record of the person charged with the underlying drug offense, and the severity of that offense should be considered when determining whether the forfeiture of property is proper.
"Drug use is a serious problem and I agree that strong measures are needed in dealing with the problem. However, I believe that the forfeiture laws are being used more frequently to punish users like Kelley rather than to punish those higher up the drug distribution chain who are profiting from the sale of illegal drugsthose whom I believe the forfeiture laws were intended to punish. I fear that the state is edging ever closer to abusing the forfeiture laws, confiscating individuals' property with no thought or proof of whether the items it is taking are actually the fruits of illegal drug sales or are actually being used to facilitate drug use or distribution."
766 So.2d at 836-37 (Monroe, J., concurring specially).
This court granted Kelley's petition for the writ of certiorari, to consider this forfeiture in light of the United States Supreme Court's holdings in United States v. Bajakajian, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), and Austin v. United States, 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). In Austin, the Supreme Court clearly established the principle that civil forfeitures are limited by the Excessive Fines Clause of the Eighth Amendment. In Bajakajian, the Supreme Court articulated the test for determining whether a punitive forfeiture is excessive:
"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality. The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish.... Until today, however, we have not articulated a standard for determining whether a punitive forfeiture is constitutionally excessive. We now hold that a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."
524 U.S. at 334, 118 at S.Ct. at 2036. After stating that neither the text of the Excessive Fines Clause nor its history provides guidance as to how disproportional a punitive forfeiture must be to the gravity of an offense in order to be "excessive," the Supreme Court stated that a court must rely upon other considerations in determining the issue of excessiveness:
"We must therefore rely on other considerations in deriving a constitutional excessiveness standard, and there are two that we find particularly relevant. The first, which we have emphasized in our cases interpreting the Cruel and Unusual Punishments Clause, is that judgments about the appropriate punishment for an offense belong in the first instance to the legislature.... The second *840 is that any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise. Both of these principles counsel against requiring strict proportionality between the amount of a punitive forfeiture and the gravity of a criminal offense, and we therefore adopt the standard of gross disproportionality articulated in our Cruel and Unusual Punishments Clause precedents. See, e.g., Solem v. Helm, [463 U.S. 277 at 288, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)]; Rummel v. Estelle, 445 U.S. 263, 271, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).
"In applying this standard, the district courts in the first instance, and the courts of appeals, reviewing the proportionality determination de novo, must compare the amount of the forfeiture to the gravity of the defendant's offense. If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional."
Bajakajian, 524 U.S. at 336-37, 118 S.Ct. at 2037-2038.
The language of § 20-2-93(a)(5), a portion of Alabama's civil-forfeiture statute, is essentially identical to the language of 21 U.S.C. § 881(a)(4), insofar as it relates to this case. Both statutes provide for the forfeiture of "[a]ll conveyances ... which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of ... property described [in preceding subdivisions]." The Alabama Uniform Controlled Substances Act (§ 20-2-1 et seq., including the forfeiture provisions), was enacted "to be in conformity with the ... Federal Comprehensive Drug Abuse Prevention and Control Act of 1970." See the title of Act No. 1407, Ala. Acts 1971, p. 2378. The forfeiture provisions of our Code are subject to the Excessive Fines Clauses of the Alabama Constitution, Art. I, § 15, and the Eighth Amendment to the United States Constitution.
Kelley argues that the forfeiture of a $30,000 automobile as punishment for one adjudged a youthful offender and sentenced to participate in a drug-court program (without a fine) is grossly disproportionate to the offense and is therefore, under the standard articulated in United States v. Bajakajian, excessive. He further contends that the forfeiture of a $30,000 automobile as punishment for possession of a controlled substance is excessive if the automobile was not a substantial and meaningful instrumentality in the commission of the offense.
We agree. Kelley was charged with a Class C felony, an offense carrying a maximum $5,000 fine. No fine was imposed. Comparing the legislature's assessment of the gravity of Kelley's crime with the $30,000 forfeiture the state seeksa forfeiture in an amount six times the maximum fine the legislature has allowed the courts to impose in such a casewe conclude that such a forfeiture would be grossly disproportional to the gravity of his offense. The forfeiture sought bears no articulable correlation to any injury suffered by the state. As the Court of Civil Appeals has stated: "When the government is empowered by law to confiscate the property of its individual citizens, we must require it to exercise that power with the greatest of care." Dent v. State, 714 So.2d 985, 987 (Ala.Civ.App.1997), cert. denied, 714 So.2d 988 (Ala.1998).[1] As Judge Monroe stated in his special concurrence in this present case, the state's power to confiscate the property of its citizens carries with it the great responsibility of using that power as it was intended. There is no question that the intention of the statute was to remove financial reward derived from the sale of drugs, not to enrich the state by the imposition of an excessive fine.
*841 The judgment of the Court of Civil Appeals is reversed, and the cause is remanded for an order or proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and HOUSTON, COOK, LYONS, and JOHNSTONE, JJ., concur.
MADDOX and BROWN, JJ., dissent.
MADDOX, Justice (dissenting).
I respectfully dissent. I believe the Court of Civil Appeals reached the correct result in this case, and I would affirm.
The majority relies on United States v. Bajakajian, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), to support its conclusion that the judgment of the Court of Civil Appeals must be reversed. I believe that Bajakajian is distinguishable, because the underlying crime in that case and the crime in this case are quite different. In Bajakajian, the defendant was guilty only of a failure to report the movement of funds from the United States to another country. The United States Supreme Court wrote:
"Respondent's crime was solely a reporting offense. It was permissible to transport the currency out of the country so long as he reported it. Section 982(a)(1) [of 18 U.S.C.] orders currency to be forfeited for a `willful' violation of the reporting requirement. Thus, the essence of respondent's crime is a willful failure to report the removal of currency from the United States. Furthermore, as the District Court found, respondent's violation was unrelated to any other illegal activities. The money was the proceeds of legal activity and was to be used to repay a lawful debt. Whatever his other vices, respondent does not fit into the class of persons for whom the statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader."
Bajakajian, 524 U.S. at 337-38, 118 S.Ct. at 2038. In contrast to Bajakajian, this case involves serious criminal activity in that Kelley was convicted of possession of a controlled substance.
Bajakajian is also distinguishable because, as the Supreme Court held:
"The forfeiture in this case [Bajakajian] does not bear any of the hallmarks of traditional civil in rem forfeitures. The Government has not proceeded against the currency itself, but has instead sought and obtained a criminal conviction of the respondent personally. The forfeiture serves no remedial purpose, is designed to punish the offender, and cannot be imposed upon innocent owners. Section 982(a)(1) thus descends not from historic in rem forfeitures of guilty property, but from a different historical tradition: that of in personam, criminal forfeitures. Such forfeitures have historically been treated as punitive, being part of the punishment imposed for felonies and treason in the Middle Ages and at common law."
Bajakajian, 524 U.S. at 331-32, 118 S.Ct. at 2035. In contrast, as the State points out in its brief, "Kelley's case was an in rem civil forfeiture, pursuant to a civil statute, against the vehicle used by Kelley to possess" controlled substances. Brief of the State of Alabama at 19.
On the issue of proportionality, used by the majority to reverse, see Bennis v. Michigan, 516 U.S. 442, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996), reh'g denied, 517 U.S. 1163, 116 S.Ct. 1560, 134 L.Ed.2d 661 (1996), in which the United States Supreme Court affirmed the forfeiture of an automobile in a case where a husband used the automobile for solicitation, and his wife, who had an ownership interest in the automobile, had no knowledge of his activities. The Supreme Court affirmed the forfeiture of the automobile in Bennis even though the forfeiture deprived the wife of her property interest in the automobile. Although I realize that other courts have reached decisions similar to that which the majority reaches today,[2] I believe the *842 United States Supreme Court's stated standards do not require the reversal of the forfeiture in this case.
BROWN, J., concurs.
NOTES
[1] We note that the facts of Dent v. State have given rise to another case now pending on certiorari review in this Court. Ex parte Dent (No. 1980764). That pending case presents the single issue whether the petitioner Dent is entitled to reimbursement for the devaluation of his vehicle that was forfeited, given that that forfeiture was held on appeal to violate the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.
[2] See, e.g., One 1995 Toyota Pick-Up Truck v. District of Columbia, 718 A.2d 558 (D.C. 1998), in which the Court of Appeals of the District of Columbia reversed the forfeiture of an automobile used for solicitation.